Max Putnam and Elizabeth Putnam v. Commissioner.
Putnam v. Commissioner
Docket No. 39811.
United States Tax Court
T.C. Memo 1954-37; 1954 Tax Ct. Memo LEXIS 211; 13 T.C.M. (CCH) 458; T.C.M. (RIA) 54141; May 12, 1954, Filed *211 Held, loans made by petitioner created valid debts, which became worthless in 1947 and 1948. Petitioner's losses from the worthlessness of these debts were not incurred in his business. Richard E. Williams, Esq., for the petitioners. Merl B. Peek, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax against the petitioners of $1,411.16 for 1947 and $2,121.56 for 1948. The questions presented are whether valid debts were created as a result of loans made by the petitioner, and, if so, whether the losses from the worthlessness of these debts were incurred in petitioner's trade or business. *212 Certain other adjustments in petitioners' net income for 1948 are not contested. The joint income tax returns of the petitioners, Max and Elizabeth Putnam, were filed with the collector of internal revenue for the district of Iowa. Findings of Fact The stipulated facts are so found, and the stipulation and the exhibits thereto are incorporated herein by this reference. The petitioners are husband and wife, and they reside in Des Moines, Iowa. Max Putnam, hereafter called petitioner, is a lawyer and has been continuously in the general practice of law in Des Moines since 1931. Between 1936 and 1941 petitioner was legal counsel to the Hawkeye Casualty Company, a large insurance corporation doing business in Iowa. He bought $19,000 worth of the company's capital stock and, in addition to acting as its legal counsel, petitioner became a director of the company and advised it in its financial affairs. In the 1930's he was a legal representative of the American Farmers Mutual Automobile Insurance Association. In the course of this association he made a loan of $4,000 in 1939 to the general secretary in charge of the company. In 1943 the petitioner loaned $350 to one of his clients, *213 an inventor, for the development of an invention by the client, and petitioner devoted a considerable amount of time to the promotion of the invention. Between 1951 and 1953 petitioner loaned $800 to a client for the organization of an ultra high frequency television company. He assisted in the organization of the Fortune Laboratories, Inc., an Iowa research and development corporation, and bought $2,350 worth of its stock and was named the corporation's secretary-treasurer. On two occasions in 1951 the petitioner loaned $5,000 to the Modern Lighting and Manufacturing Company, an Iowa corporation, for which he acted as legal counsel. Between 1942 and 1953 he was legal counsel to the Iowa Chiropractors Association. In addition to his legal work for the association petitioner participated generally in the association's activities, and on different occasions he loaned money or endorsed promissory notes for the association. Petitioner was solicited to buy a one-third interest in a pre-concrete step manufacturing enterprise, but he did not make the purchase, although he subsequently bought stock in this company. Petitioner was legal counsel to the Wilbert Vault Company of Iowa and on one *214 occasion he loaned money to the company's Texas branch. In 1944 petitioner became legal counsel to Local 441 of a railway workers union in Des Moines and continued as its counsel until 1949. Through the union's business agent he met Meredith Case, editor of the Des Moines Federationist, a weekly newspaper published by the Iowa labor unions, and Leo Quinn, business manager of the Des Moines branch of the Teamsters Union, A.F. of L. With Quinn and Case petitioner formed the Whitehouse Publishing Company in 1946 for the purpose of carrying on a general printing and publishing business. The authorized capital stock of the corporation was 15 shares of a par value of $100 a share. Each of the organizers, petitioner, Quinn, and Case, received 5 shares of stock. As his contribution to the capital of the corporation, and on behalf of Case and Quinn, the petitioner transferred to the corporation a lot worth $1,000 and paid $5,500 to have a building constructed on the lot. The petitioner also made an initial contribution of $1,500 as working capital for the corporation. He played a principal part in organizing the company and in carrying on its business, and personally guaranteed payment of *215 all supplies purchased by Whitehouse and guaranteed payment of the salaries of the company's employees. On August 20, 1946, the petitioner and Whitehouse borrowed $12,075 from a bank for the use of the corporation and signed a promissory note for the amount as co-makers. Payments were made on this note and its principal reduced to $3,500 by July 30, 1947. In October of 1946, Quinn and Case made conditional transfers of their shares of stock to petitioner, title to the shares to be transferred to petitioner if they failed to meet the payments on any of their promissory notes to him. Quinn and Case contributed none of their own money to the capital of the corporation or to its operating expenses, since they had no funds other than those necessary for their daily living expenses, but they gave the petitioner promissory notes for his contributions on their behalf. On November 1, 1946, Quinn and Case each executed a promissory note to petitioner for $3,070.85, and on November 13, 1946, each executed a promissory note for $1,175.31. These four notes totalled $8,492.32, and represented for each of the makers an amount equal to one-third of the cash and cost of real estate transferred by the *216 petitioner to the Whitehouse Publishing Company on or before November 13, 1946. On November 13, 1946, petitioner borrowed $3,500 and made it available to the corporation. In February 1947 Case's notes to petitioner were cancelled and his stock in Whitehouse assigned to the petitioner. In lieu of Case's notes the petitioner was to receive promissory notes for the same amount from Whitehouse. In March 1947, the petitioner and Whitehouse borrowed $5,000 from a bank and signed a promissory note for the amount as co-makers. In July 1947, Quinn's notes to petitioner were cancelled and his stock in Whitehouse assigned to the petitioner. In lieu of Quinn's notes the petitioner was also to receive promissory notes for the same amount from Whitehouse. Neither Case nor Quinn was able to repay his debt to the petitioner. By the middle of 1947 it was evident that the publishing venture was unsuccessful. In July 1947, Whitehouse's only substantial assets were its building and equipment, and it was receiving some income from payments on purchase orders for a publication it had printed. At the same time it had a $13,500 indebtedness. In July 1947, Whitehouse sold its building for $7,000 and ceased *217 to do business. Of this amount $5,000 was used by the corporation toward paying off its promissory note of August 1946, and $2,000 went to petitioner to pay him for his advances to the corporation. In December 1948, the petitioner paid $3,500 indebtedness remaining on the August 20, 1946 promissory note, and at the same time he paid the $5,000 promissory note of March 1947. On his 1947 income tax return, filed jointly with his wife, the petitioner claimed as a business bad debt deduction $8,492.32, the total amount of the promissory notes given to him by Quinn and Case. On his 1948 income tax return, also filed jointly with his wife, the petitioner claimed a business bad debt deduction of $9,005.21, which consisted of the $8,500 paid by him on the promissory notes of August 20, 1948 and March 1947, executed by him and Whitehouse as co-makers, together with the interest on these notes. Opinion In computing net income the Internal Revenue Code permits the deduction of bad debts that became worthless within the taxable year. Section 23(k)(1). In the case of an individual taxpayer the amount of the deduction is made to depend on the manner in which the debt became worthless, or *218 on whether the debt is evidenced by a security. If the worthlessness was incurred in the taxpayer's trade or business, the whole amount of the loss is deductible; if not incurred in the taxpayer's trade or business, the loss is treated as a short-term capital loss. Section 23(k)(1) and (4). The petitioner's argument is that the debts in question became worthless in his business, since the recipients of his loans were generally his clients, and he hoped by his loans to strengthen his business relationships with them and to contribute to the possibility of increased law business for himself. Alternatively, he suggests that the amounts in question be treated as ordinary and necessary business expenses under section 23(a)(1)(A) of the Code; or as losses incurred in business or in transactions entered into for profit, though not connected with business (Section 23(e)(1) or (e)(2)). In opposition the respondent makes the following contentions: (a) the contributions to capital made by the petitioner on behalf of Quinn and Case did not create valid debts, because the petitioner could not have reasonably expected to be repaid since neither of these men had any funds other than those necessary *219 for their daily living expenses; (b) the petitioner's paying off the bank loans made to Whitehouse did not give rise to debts owed to him, since he was a co-maker of the promissory notes given to the lending bank and hence was primarily liable for the amounts of the loans; and (c) if valid debts are found to exist, they are non-business debts because they were not incurred in any business of the petitioner. While it is true, as petitioner admitted in his testimony, that at the time of his advances to the capital of the corporation on behalf of Quinn and Case, they had no substantial funds other than those necessary for their daily living, it does not follow from this that valid debts could not have been created. Although Quinn and Case admittedly had no substantial tangible assets, they were to go to work for Whitehouse and to contribute their experience to the undertaking. Case had been editor of a weekly labor newspaper in Iowa, and Quinn was an experienced union official. It seems to us that the petitioner had good reason to anticipate success for the publishing venture and consequently to expect that he would be repaid by Quinn and Case. Cf. , *220 and cases there cited. More troublesome, however, is the petitioner's later treatment of these debts. In February and July 1947, Quinn and Case each executed an "Assignment, Bill of Sale & Release" by which they transferred outright to the petitioner their shares of stock in Whitehouse in return for his cancellation of their indebtedness to him; in addition the petitioner was to receive promissory notes from Whitehouse in the same amounts as the Quinn and Case notes. It does not appear whether this obligation was ever acknowledged on behalf of Whitehouse or whether such notes were ever received from the corporation. Despite this attempted substitution of debtors, the petitioner was not much better off, since by mid-July 1947 Whitehouse was in poor financial condition. At this time the corporation's only substantial assets were its building and equipment, and it was receiving some income from payments on purchase orders for a publication it had printed. At the same time it had a $13,500 indebtedness on its promissory notes to a bank. In July 1947 Whitehouse sold its building and used most of the proceeds of the sale as payment on one of its promissory note obligations. By this time *221 it was evident that the publishing venture was not successful and that the corporation was insolvent. Therefore, whether Quinn and Case or Whitehouse be considered as the debtor, we are of the opinion that the debts arising out of the petitioner's advances to the capital of Whitehouse on behalf of Quinn and Case became worthless in 1947. In order to obtain bank loans for Whitehouse it was necessary that petitioner sign promissory notes for the amount of the loans as co-maker with the corporation, and as such he, together with the corporation, was primarily liable on the notes. The petitioner, while acknowledging that he signed the notes as a co-maker, argues that it was understood that Whitehouse was to be primarily responsible for the repayment of the loan, and that he was acting only as a guarantor of the corporation's obligation. Considering that the money loaned was used for the business of the corporation and that the granting of the loan would have been unlikely without the petitioner's signature as co-maker, we think it is reasonable to infer that it was understood that Whitehouse was to be primary obligor on the notes, and that if the petitioner were required to pay, he would *222 be reimbursed by the corporation. In December 1948 the petitioner paid off the two notes that he signed as co-maker with the corporation. Thereupon Whitehouse's obligation to reimburse him came into being, and since the corporation was insolvent, this debt was worthless at its origin. . The respondent nevertheless contends that since one of the two notes paid by the petitioner in December 1948, which renewed an earlier note of March 27, 1947, was executed by the petitioner and Whitehouse as co-makers on September 27, 1948, when the corporation was hopelessly insolvent and not doing business, although still in existence, the petitioner cannot claim to be a guarantor on this note since at the time he signed there was no possibility of his being reimbursed by the corporation. We see no merit in this argument. The petitioner has established that at the time the original note of March 27, 1947, was signed by him and Whitehouse as co-makers, it was understood that he was acting as a guarantor. We do not think that the petitioner's signing a renewal note on September 27, 1948, as co-maker with Whitehouse should disturb his *223 guarantor status, since in practical effect the later note created no new obligation but merely extended the time of payment of the original note. Having decided that the debts owed to the petitioner by Quinn and Case and by Whitehouse were valid debts and that these debts became worthless in 1947 and 1948, there remains the question of the nature of the debts: whether business or non-business. As previously indicated the petitioner contends that his financing clients was a part of his law business, and in support of this argument he testified to various instances in which he loaned money to clients and actively participated in the promotion of their business enterprises. "Business" as used in section 23(k)(1) and (4) means an occupation to which the taxpayer regularly devotes his time, effort and money in order to earn his livelihood or as a means of acquiring wealth. It does not include isolated transactions, even though they are entered into for profit and are business transactions in the usual sense of the word; nor does it include taking care of one's own investments ( , rehearing denied, ), or *224 carrying on the business of a corporate enterprise ( , certiorari denied, , no matter how much time is devoted to these activities. In order to meet his burden of proof the petitioner has demonstrated that between 1936 and 1948 he made approximately nine loans to his clients, including the six loans in question here. He also referred to two other loans but did not specify when they were made. The petitioner mentioned that he bought shares of stock in a few of his corporate clients and that he was asked to invest in a company to manufacturer concrete steps. We do not think that this demonstrates a sufficient activity on petitioner's part over a period of twelve years to warrant a finding that he was regularly engaged in financing his clients. Cf. , (taxpayer's appeal to C.A. 6 dismissed for want of prosecution, December 16, 1952); ; . The petitioner devoted a considerable amount of his testimony to describing his work on behalf of his *225 clients, most of which were corporations. Some of the work he described was closely related to his financing activities, but most of it was either the customary services of a lawyer to his client or was the business of the corporate client being carried on by the petitioner. Accordingly we find that the debts of Quinn and Case, which became worthless in 1947, and the debts of the Whitehouse corporation, which became worthless in 1948, were non-business debts. Having thus characterized these debts, there is no need of our considering the petitioner's alternative arguments. Decision will be entered for the respondent.